In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-08-00092-CV


____________________



UNION PACIFIC RAILROAD COMPANY, Appellant



V.



DERRICK CEZAR, INDIVIDUALLY AND AS NEXT FRIEND OF 


JASMINE CEZAR, JARVIS ARDOIN, LASHASA ARDOIN, 


AND LORENZO ARDOIN, Appellee






On Appeal from the 60th District Court


Jefferson County, Texas


Trial Cause No. B-176,429






OPINION


 This appeal arises from a collision between a pickup and a train in Vinton, Louisiana. 
We reverse and remand with instructions to transfer the case to the District Clerk in Harris
County, Texas.

Background Facts


 On the afternoon of July 22, 2005, a Burlington Northern Santa Fe (BNSF) freight
train traveling on Union Pacific Railroad's (UP's) right-of-way struck a pickup driven by
Patsy Ardoin. Ardoin died at the scene. Ardoin's daughter, Jasmine, was a passenger in the
pickup; she received spinal cord injuries resulting in paraplegia.

 The collision occurred at the Eddy Street crossing (hereinafter "the crossing") in
Vinton, Louisiana. The railroad tracks run in a generally east-west direction through Vinton. 
Ardoin was traveling in a northerly direction on Eddy Street just before the collision. When
the accident occurred, the crossing did not have warning devices that automatically activated
when a train approached. Instead, the crossing's protection consisted of signs. A crossbuck
sign, which is the familiar, white, X-shaped sign with black letters spelling out "RAILROAD
CROSSING," located approximately nineteen feet from the crossing, notified drivers of the
presence of the railroad tracks. A stop sign, on the south side of the tracks approximately
forty-three feet from the crossing, required northbound drivers to stop before crossing the
tracks. Ardoin stopped at the stop sign just before she tried to cross the tracks. The BNSF
train was eastbound, so it approached the crossing from Ardoin's left, or from the west. The
angle between the tracks and the west side of Eddy Street is sixty degrees. 

 There are a total of four railroad crossings in Vinton; the other three crossings had
gates and lights at the time of Ardoin's collision. Of the four crossings, the Eddy Street
crossing is the farthest east. Train speeds through Vinton vary, with passenger trains
authorized to travel at a speed of seventy miles per hour and freight trains authorized to travel
at a speed of forty-five miles per hour.

 The testimony reflects that five prior collisions had occurred at the crossing: one in
1977, two in 1998, and two in 2001. During a 1996 upgrade to the crossing on Horridge
Street, which is the street immediately west of the crossing, the crossing was temporarily
closed. When the State directed the closure of the crossing during this upgrade, the existing
warnings at the crossing were removed. In the summer of 1997, despite its desire to see the
crossing remain closed, the State instructed UP to reopen the crossing after the City of
Vinton complained that the crossing had been closed without its authorization. After
authorizing UP to reopen the crossing, the State continued to pursue the City's authorization
to again close the crossing; the City's officials never did so. 

 In February 2006, Derrick Cezar, on behalf of his daughter, Jasmine, Ardoin's estate,
and on behalf of Ardoin's three other children, commenced a suit in Jefferson County, Texas,
against BNSF and several BNSF employees, and against UP and one of its employees. Prior
to trial, the claimants added two additional UP employees to the suit. In their Sixth Amended
Petition, the pleading on which they proceeded to trial, the claimants alleged that the accident
had been caused by BNSF's negligent operation of the train, UP's failure to maintain
adequate unobstructed sight distances, and UP's failure to install adequate warning devices
at the crossing.

 At the conclusion of the jury trial, the trial court did not submit any issues against
BNSF or any of the individually named defendants. Based on the issues submitted, the jury
found UP and Ardoin negligent. The jury placed fault as follows: (1) sixty-five percent on
UP, (2) fifteen percent on Ardoin, and (3) twenty percent on the Louisiana Department of
Transportation ("LDOT"), a non-party. Based on the jury's findings, the trial court entered
a judgment against UP from which UP appeals.

Issues on Appeal


 In six issues, UP raises numerous complaints about the trial. In issue one, UP argues:
(1) it had no duty to install any active warning devices at the crossing, (2) it had no authority
from public officials to install active warning devices at the crossing, and (3) federal law
preempts any state tort claim asserting that UP should have installed lights and automatic
gates. In issue two, UP complains that the trial court made various errors in admitting and
excluding evidence. In issue three, UP asserts that the evidence is factually insufficient to
support the jury's apportionment of fault. Issues four and five argue the trial court erred in
various respects by giving erroneous instructions and by submitting issues not recognized
under Louisiana law. In issue six, UP contends that venue for the trial was not proper in
Jefferson County, Texas. 

 Because we are required to address all rendition issues, we will first address UP's 
issues that would result in a rendition of judgment in its favor before we address its other
issues that would result in a new trial. 


Summary of the Evidence Related to the Crossing's History


 Sergeant Michael Wright, a City of Vinton Police Department patrol officer,
witnessed the collision. According to Sergeant Wright, he stopped behind a pickup located
in the northbound lane just south of the crossing. Sergeant Wright heard the train's horn and
noticed an eastbound train as it approached the crossing from the west. As the train
approached, Sergeant Wright noticed that after having been stopped for several seconds at
the stop sign, the pickup began to slowly move forward until it had pulled onto the train's
tracks. Immediately after the collision, Sergeant Wright went to the pickup and found Ardoin
dead inside. Jasmine, a four-year-old child, had been ejected but Sergeant Wright found her
nearby. Hospital records reflect that Jasmine suffered a cervical spine fracture, spinal cord
injury, and a fractured femur.

 Much of the evidence during the trial related to the history of the crossing and the
apparent differences of opinion between state and city officials concerning whether the 
crossing should be opened or remain closed. The evidence reflects that some trains passed
through Vinton at high speeds, as "timetable" speeds for trains through Vinton allowed
certain trains to travel up to seventy miles per hour. A 2002 letter from LDOT to Vinton's
mayor recommended that the City close the crossing. Earlier, in 1997, under a federal
crossing improvement program, the warnings at the adjacent railroad crossing on Horridge
Street had been upgraded to include flashing lights and gates. Also, in 1997, and based on
instructions from LDOT, UP closed the crossing.

 Prior to the crossing's closure, the crossing's protection included a "wigwag." (1)
 
Generally, the jury heard testimony that showed Vinton city officials did not want the 
crossing permanently closed. David Riggins, who had been elected as a councilman shortly
after the crossing's closure, went to Washington, D.C. and discussed with Louisiana's United
States Senators and a Louisiana Congressman the City's complaints regarding the closure of
the crossing. Because the crossing had been closed on LDOT's instruction but without the
required authorization by the City of Vinton, in June 1997, LDOT directed that UP arrange
to "install a new crossing at Eddy Street and remove the road closure barriers." According
to the information in LDOT's June 1997 letter, the reinstallation of the wigwag was not
feasible because it would not be compatible with the new gates and the circuitry recently
installed at the adjacent Horridge Street crossing. LDOT'S letter further instructed: "The
crossing will be reopened as a passive crossing with crossbucks (installed and maintained by
your railroad) and stop signs (installed and maintained by the town[).]" When the crossing
was subsequently reopened in 1997, it was not protected by any warnings that activated to
warn of an approaching train. Further, the evidence indicates that the City never objected
that the crossing had been reopened without wigwags, flashing lights, or gates.

 Following a fatal collision at the crossing in November 2001, the City and LDOT
renewed discussions about the crossing. Riggins, formerly a councilman but elected Vinton's
mayor in July 2001, sought input on the City's desire to improve the crossing's safety from
someone with UP, whom Riggins understood to be the person with jurisdiction over the
railroad in the area. Mayor Riggins indicated to UP's area representative that the City would
be a willing participant in the crossing's upgrade. According to Mayor Riggins, UP's
representative advised him that while UP would be responsible for maintenance on any lights
and gates, UP "can't go in and do anything without orders from the State." Consequently,
the Mayor began to seek what he believed to be the necessary authorization from the State. 
 The City never offered to pay UP to install additional safety devices at the crossing. 

 Subsequently, Mayor Riggins approached LDOT to express his interest in upgrading
the crossing and to make known the City's interest in participating in such a project. In 2002,
Mayor Riggins received LDOT's written response, in which LDOT advised that it was
"compelled to reiterate [LDOT's] strong recommendation of the reclosure of the Eddy Street
crossing to vehicular traffic."

 Nevertheless, Mayor Riggins desired that the crossing remain open, and he advised
LDOT that the City had existing funds or would obtain additional funds to keep the crossing
open and that it would also "match the technology at Horridge Street" as long as "after the
installation there was no liability that would tie the town to any, you know, upkeep or, God
forbid, fatalities or accidents or [things] of that nature." LDOT never responded to the
Mayor's offer. At the end of Mayor Riggins's term in 2006, no additional warnings had been
installed at the crossing.

UP's Rendition Arguments


 Although the parties dispute that proper venue for the suit existed in Jefferson County,
Texas, for reasons of judicial economy, we must first consider UP's issues that might dispose
of the need for further jury proceedings. See Marathon Corp. v. Pitzner, 106 S.W.3d 724,
727-30 (Tex. 2003) (addressing proximate cause issue without reaching venue issue); CMH
Homes, Inc. v. Daenen, 15 S.W.3d 97, 99 (Tex. 2000) (addressing whether there was legally
sufficient evidence to support the judgment without considering whether venue was proper). 
In this appeal, UP's first issue asserts three different arguments for the proposition that it had
no legal duty to Ardoin to install additional warning devices at the crossing. First, UP asserts
that a judgment should be rendered in its favor because the evidence about this particular
crossing demonstrated that UP satisfied its only duty under Louisiana law by providing
crossbucks. Second, UP argues that it had no authority under Louisiana law to install gates
and lights on a public roadway without the permission of public officials. Third, UP argues
that it proved that federal law preempted Louisiana's state law with respect to the warnings
required under the law to be present at this crossing; consequently, UP concludes that
because it received federal funds to erect crossbucks, it had no additional state law duties to
motorists.

Choice of Law

 Before discussing the duty issues, we first address whether we are required to apply
Texas or Louisiana law to the duty issue. With respect to accidents occurring in other states,
Texas applies the "most significant relationship" test to the issue involved to determine what
law applies. See Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 421 (Tex. 1984) (adopting
the "most significant relationship" method for resolving conflicts of law in all cases "except
those contract cases in which the parties have agreed to a valid choice of law clause"). The
factors considered when deciding choice of law matters in personal-injury cases consist of
the following: (1) the place where the injury occurred (in this case, Louisiana); (2) the place
where the conduct causing the injury occurred (Louisiana); (3) the domicile, residence,
nationality, place of incorporation, and place of business of the parties (the claimants are
domiciled in Louisiana and UP is a Delaware corporation with its principal place of business
in Omaha, Nebraska; UP also conducts business in Louisiana); and (4) the place where the
relationship, if any, between the parties is centered (Louisiana). Hughes Wood Prods., Inc.
v. Wagner, 18 S.W.3d 202, 205 & n.1 (Tex. 2000) (citing Restatement (Second) of
Conflict of Laws § 145(2) (1971)); see also Alumbaugh v. Union Pac. R.R. Co., 322 F.3d
520, 523 (8th Cir. 2003) ("Union Pacific is a Delaware corporation with its principal place
of business in Omaha, Nebraska[.]").

 Moreover, in this case, all of the parties rely on Louisiana law in their arguments
concerning UP's duty, and no party proposes that the law of some other state should be
applied. Applying the Restatement factors, and considering that all parties rely on Louisiana
law, we conclude that Louisiana's substantive law applies to the issue of UP's duties to the
traveling public at a Louisiana railroad crossing.

Standard of Review-Disputed Facts Relevant to UP's Duty at the Crossing

 To some extent, as fully discussed below, Louisiana's duty analysis involves an
evaluation of testimony and facts about the crossing at issue that are presented during a trial.
At a trial's conclusion, a jury either expressly or implicitly resolves the disputes, including
any disputes over each of the witness's credibility, and further decides the weight to be given
to particular evidence. Here, the judgment resolved the dispute in the claimants' favor;
therefore, we review UP's challenge to the legal sufficiency of the evidence under
established standards. 

 When the challenge is to an adverse finding on an issue for which the appellant had
the burden of proof at trial, the appellant must show on appeal that, as a matter of law, the
evidence establishes all vital facts in support of the issue. Dow Chem. Co. v. Francis, 46
S.W.3d 237, 241 (Tex. 2001). In determining whether the evidence is legally sufficient to
support a factfinder's determination of a disputed fact, appellate courts must view the
evidence in the light favorable to the verdict, crediting favorable evidence if a reasonable fact
finder could and disregarding contrary evidence unless a reasonable fact finder could not.
City of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005). In doing so, appellate courts
recognize that "[j]urors are the sole judges of the credibility of the witnesses and the weight
to give their testimony." Wilson, 168 S.W.3d at 819. Because most of a jury's credibility
decisions are implicit, we are required to "assume that jurors credited testimony favorable
to the verdict and disbelieved testimony contrary to it." Id. The evidence is conclusive on
an issue if reasonable people, based on the evidence in the record, could reasonably reach the
conclusion, even if our opinion, had we been jurors, differs. See id. at 822. Since the
judgment favored the claimants, who bore the burden to prove that the crossing remained
unreasonably dangerous despite the presence of crossbucks and that UP had authority to
install additional warnings, we construe the conclusions the jury reached in the light most
favorable to upholding those findings.


Louisiana's Duty Analysis

 U.P. argues that "[e]ven if added warning devices may improve safety, the railroad
owes no legal duty to install them." We do not agree that Louisiana law never requires added
warning devices to improve a crossing's safety, and our review of Louisiana's crossing cases
reflects that Louisiana courts have imposed an additional duty depending on the known
circumstances existing at a crossing involved in a collision.

 Generally, Louisiana's duty rule is stated in Louisiana's Civil Code, which provides
that "[e]very act whatever of man that causes damage to another obliges him by whose fault
it happened to repair it." La. Civ. Code Ann. art. 2315 (2009). With respect to crossing
accidents, whether a railroad owes a duty to install more than crossbucks at a crossing under
Louisiana's law is analyzed by applying a duty-risk analysis. Duncan v. Kansas City S. Ry.
Co., 773 So.2d 670, 676 (La. 2000) (applying duty analysis under Louisiana law to railroad
crossing accident). "Under this analysis, [the] plaintiff must prove that the conduct in
question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the
plaintiff, the requisite duty was breached by the defendant[,] and the risk of harm was within
the scope of protection afforded by the duty breached." Id. at 675. 

 In analyzing the railroad's duty, the Duncan court began by noting that under
Louisiana law, railroads are required to provide signage at all crossings within their control. 
Id. at 676; see also La. Rev. Stat. Ann. § 32:169 (1994), amended by 2006 La. Acts, No.
11, § 2; 2002 La. Acts, 1st Ex. Sess., No. 156, § 1; 1998 La. Acts, No. 122, § 1). Based on
the evidence of the surrounding conditions that existed at that crossing, and even though the
railroad had complied with its statutory duty to install crossbucks at the crossing, the Duncan
court stated: "[T]he jury could have reasonably concluded that [Kansas City Southern] had
a duty to [the] plaintiffs to protect against the unique hazard presented by the East Iowa Road
crossing." Id. at 677. The Duncan Court, in its discussion of the duty issue, cited to its
opinion in Syrie v. Schilhab, 693 So.2d 1173, 1176-77 (La. 1997). Duncan, 773 So. 2d at
675-76.

 Syrie provides further insight into a proper Louisiana duty analysis and merits
discussion. In Syrie, the Louisiana Supreme Court decided whether a state trooper, who
stopped to flag traffic following a one-car collision, owed a duty to various plaintiffs who
were injured when a truck rear-ended a car that then hit the wrecker positioned to retrieve the
car involved in the initial accident. Syrie, 693 So. 2d at 1176-77. In deciding that the trooper
had a duty to protect the motorists from the truck, the Syrie court noted that a law
enforcement officer has the power to regulate traffic and a duty to exercise that power to
reasonably refrain others from causing harm. Id. at 1177. The Louisiana Supreme Court
explained: "When a law enforcement officer becomes aware of a dangerous traffic situation,
he has the affirmative duty to see that motorists are not subjected to unreasonable risks of
harm." Id. (citation omitted).

 Duncan's holding reflects the Court's reasoning that when the record contains
evidence that raises a reasonable inference that the railroad possessed knowledge of risks
posed by unique circumstances at a crossing, and also possessed knowledge that adequate
steps had not been taken to make the condition safe, that the railroad's duty to motorists is
not discharged by erecting crossbucks at the crossing. See Duncan, 773 So. 2d at 677-78. 
This view is consistent with the view more recently expressed in Long v. State of Louisiana,
Through the Department of Transportation and Development, 916 So. 2d 87, 92 (La. 2005),
which discusses the historical development of the duty owed by railroads at crossings. In
Long, the Louisiana Supreme Court relied on the United States Supreme Court's discussion
of the duties of the railroad at crossings in Continental Improvement Company v. Stead, 95
U.S. 161, 24 L.Ed. 403 (1877). See Long, 916 So. 2d at 92. In Stead, the United States
Supreme Court, describing the duty as "well-settled law," stated:

 If a railroad crosses a common road on the same level, those travelling on
either have a legal right to pass over the point of crossing, and to require due
care on the part of those travelling on the other, to avoid a collision. Of
course, these mutual rights have respect to other relative rights subsisting
between the parties. From the character and momentum of a railroad train, and
the requirements of public travel by means thereof, it cannot be expected that
it shall stop and give precedence to an approaching wagon to make the
crossing first: it is the duty of the wagon to wait for the train. The train has the
preference and right of way. But it is bound to give due warning of its
approach, so that the wagon may stop and allow it to pass, and to use every
exertion to stop if the wagon is inevitably in the way. Such warning must be
reasonable and timely. But what is reasonable and timely warning may depend
on many circumstances. 


Stead, 95 U.S. at 164. The Louisiana Court's citation to Stead is consistent with its
jurisprudence that examines the many circumstances of a crossing to determine the extent of
a railroad's duty there.

 Like Duncan, at the time of Ardoin's accident, section 32:169 of the Louisiana Civil
Code required railroads to erect crossbucks at crossings. La. Rev. Stat. Ann. § 32:169
(2005), amended by 2006 La. Acts, No. 11, § 2. However, because the accident in Duncan
occurred in 1994, the Louisiana Supreme Court did not address the 1998 amendments to
section 32:169 that are relevant to our analysis of UP's duty regarding Ardoin's 2005
crossing collision. These additional subsections of 32:169, which were not included in
Louisiana's Revised Statutes at the time the Louisiana Supreme Court decided Duncan,
provide:

 E. (1) A railroad company shall install a traffic control device or devices
at a public railroad grade crossing pursuant to an agreement with the
Department of Transportation and Development. Whenever the
department determines that a particular traffic control device needs to
be installed at a public highway railroad grade crossing, the railroad
company shall cooperate with the department in the installation of such
device or devices. In the case of a federally funded grade crossing
project, the railroad company shall enter into an agreement with the
department for the installation or upgrade of such traffic control device.
A railroad company shall not be required to provide the non-federal
share of costs involved in federally funded grade crossing improvement
projects.

 

 . . . . 


 (3) A railroad company may install a traffic control device or make
other improvements or modifications at a railroad grade crossing at its
own expense under the following conditions:


 (a) When such crossing upgrade, improvement, or
modification will improve the safety of the traveling
public, train crew members, or train passengers.


 (b) When such crossing upgrade, improvement, or
modification is needed due to the presence of hazardous
conditions or certain operation factors or a combination
of both.


 (c) When such crossing upgrade, improvement, or
modification is incidental to a railroad improvement
project relating to track structures or train control
systems.


 (4) Any upgrade, improvement, or modification performed by a railroad
company under the provisions of this Subsection shall comply with all
conditions and requirements in the Manual on Uniform Traffic Control
Devices.


 F. Nothing in this Section shall relieve a railroad company of its
responsibility to maintain safe crossings.


La. Rev. Stat. Ann. § 32:169 (2008) (as amended by 1998 La. Acts, No. 122, § 1). Thus,
the Louisiana statute that creates the railroad's duty to erect crossbucks also gives it the right
to install other devices and is not intended to "relieve a railroad company of its responsibility
to maintain safe crossings." Id.

 Generally, UP argues that even if warning devices might improve safety, UP had no
legal duty to install them. Further, UP contends that the only exception to this rule under
Louisiana law is when the crossing presents a "dangerous trap" to the motoring public. UP
argues that since the jury answered "No" to the issue about whether the crossing was a
dangerous trap, the trial court wrongly found "a further duty to install active warning devices
at the Eddy Street crossing."

 However, we are not persuaded that UP had no duty under Louisiana law to make the 
crossing reasonably safe under the circumstances presented in this record. Based on the
evidence admitted by the trial court in this case, the following circumstances are relevant to
our analysis of UP's duty to motorists at the crossing: (1) evidence from which a jury could
reasonably conclude that motorists, based on expected train speeds at the crossing, did not
generally have sufficient sight distances of approaching trains; (2) the opinion offered by
Archie Burnham, the claimants' expert witness, that the crossing posed an unreasonable risk
of danger to motorists; (3) evidence showing that before Ardoin's collision, an active
protection device, a wigwag, had been removed and the crossing had been reopened in 1997
without active warning devices to signal a train's approach; (4) a crossing collision history
showing several prior collisions before Ardoin's that had occurred after the crossing was
reopened without active protection, two of which involved fatalities; (5) testimony proving
that the three other crossings in Vinton were protected with gates and lights; (6) evidence that
established the presence of a sixty-degree angle for a northbound driver stopping at the 
crossing; (7) testimony that established relatively high expected train speeds at a crossing
located inside a town, the number of trains traveling through the crossing on a daily basis,
the volume of street traffic at the crossing, and the resulting impact of these variables on the
potential and severity of any resulting collision; and (8) evidence showing that before
Ardoin's accident, UP knew that LDOT had recommended that the crossing remain closed.
Additionally, evidence established that before Ardoin's collision, UP knew about the
presence of the wigwag at the crossing and its removal, knew of the existing physical
conditions at the crossing, was aware of the crossing's accident history following its removal
of the wigwag, and was on notice of the City's interest in improving the existing warnings
at the crossing. Under the many circumstances presented here, we conclude that UP had a
legal duty to motorists to exercise the control it did possess over installing additional warning
devices at the crossing in a reasonable and prudent manner and a fact question exists to
resolve if it had done so. 

Authority To Install Additional Signs

 In its second argument, UP argues we should render judgment in its favor because 
it had no authority to install gates and lights on a public roadway without permission from
public officials. However, claimants disagree and argue that section 32:169(E)(3)-(4) of
Louisiana's Revised Statutes expressly allow a railroad to install traffic control devices or
make other improvements or modifications at its own expense to improve the safety of the
traveling public as long as the modification complies with the Manual on Uniform Traffic
Control Devices ("MUTCD"). La. Rev. Stat. Ann. § 32:169(E) (2009).

 UP's argument relies on language in section 32:236 of Louisiana's Revised Statutes,
which provides, in part: 

 A. No person, contractor, or public service corporation shall erect or maintain
any sign of any nature or a traffic control device or any thing resembling a
traffic control device within the right-of-way of any highway or street, without
having official permission to install or maintain same in the public right-of-way under the provisions of R.S. 48:344 and R.S. 48:381, except the governing
authority maintaining the highway or street.


 . . . . 


La. Rev. Stat. Ann. § 32:236 (2009). This language appears to conflict with language in
32:169(E)(3)-(4), which grants a railroad authority to erect signs. Thus, UP's argument 
requires that we engage in statutory interpretation of Louisiana's law. In undertaking an
issue of statutory construction, Louisiana's Supreme Court recently stated:

 "[W]hen the words of a law are ambiguous, their meaning must be sought by
examining the context in which they occur and the text of the law as a whole."
La. Civ. Code [Ann.] art. 12. It is also well established that the Legislature
is presumed to enact each statute with deliberation and with full knowledge of
all existing laws on the same subject. [State v.] Johnson, 884 So. 2d 568, 576
[La. 2004)]; State v. Campbell, 877 So. 2d 112, 117 [(La. 2004)]. Thus,
legislative language will be interpreted on the assumption the Legislature . . .
was aware of existing statutes, well established principles of statutory
construction and with knowledge of the effect of their acts and a purpose in
view. Johnson, 884 So. 2d at 576-77; Campbell, 877 So. 2d at 117. It is
equally well settled under our rules of statutory construction, where it is
possible, courts have a duty in the interpretation of a statute to adopt a
construction which harmonizes and reconciles it with other provisions dealing
with the same subject matter. La. Civ. Code [Ann.] art. 13; City of New
Orleans v. Louisiana Assessors' Retirement and Relief Fund, 986 So. 2d 1
[(La. 2007]).


M.J. Farms, Ltd. v. Exxon Mobil Corp., 998 So. 2d 16, 27 (La. 2008). Additionally, if after
attempting to harmonize statutes, there remains a conflict, "the statute specifically directed
to the matter at issue must prevail as an exception to the statute more general in character."
LeBreton v. Rabito, 714 So. 2d 1226, 1229 (La. 1998).
 Section 32:169(E)(3)-(4) of Louisiana's Revised Civil Statutes serves as both the
more recent and more specific statute concerning a railroad's right to erect traffic control
devices in a shared right-of-way. Moreover, when the Louisiana Legislature added the
provisions concerning a railroad's rights to erect signs in section 32:169(E) in 1998, it must
have been aware of its general prohibition contained in section 32:236. 

 We find no instance in Louisiana's case law that addresses whether a railroad, acting
pursuant to section 32:169(E)(3)-(4) may erect signs that comply with the MUTCD without
LDOT's approval. While we might utilize Louisiana's principles of statutory construction
in analyzing whether section 32:169(E)(3)-(4) constitutes an exception to the general
prohibition on erecting signs found in section 32:236, we need not do so on this record. In
this case, the evidence reflects that UP did not initiate a request to improve the crossing's
warnings with any governmental officials having jurisdiction over the crossing. In applying
Louisiana's duty analysis, and based on this crossing's location, and prior history, we hold
that Louisiana would place a duty on UP to reasonably exercise its right to request permission
from the necessary governmental entities in control of the crossing in order to improve the
warnings at the crossing. Consequently, we do not accept UP's argument that it had no duty
because it had no right to affect the crossing's warnings.

Standard of Review-UP's Preemption Argument

 UP also argues that any state law duties it had to warn at the crossing were preempted
by federal law. A party asserting federal preemption generally bears the burden of proving
that issue. See Mo. Pac. R.R. Co. v. Limmer, 180 S.W.3d 803, 809 (Tex. App.-Houston
[14th Dist.] 2005, pet. granted); see also Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255,
104 S.Ct. 615, 78 L.Ed.2d 443 (1984); Gorman v. Life Ins. Co. of N. Am., 811 S.W.2d 542,
546 n.7 (Tex. 1991); Boon Ins. Agency, Inc. v. Am. Airlines, Inc., 17 S.W.3d 52, 55 (Tex.
App.-Austin 2000, pet. denied). Therefore, to receive a rendition on appeal, UP must show
that the evidence conclusively established all of the vital facts in support of its preemption
issue. See Francis, 46 S.W.3d at 241. 

Preemption

 UP contends that it conclusively proved that federal funds participated in the
installation of the crossing's crossbucks prior to Ardoin's collision. (2) Concerns arising under
a state's law about the adequacy of signs at a crossing can be preempted by federal law when
federal funds have been used to participate in the installation of the crossing's warnings. See
Norfolk S. Ry. Co. v. Shanklin, 529 U.S. 344, 347-58, 120 S.Ct. 1467, 146 L.Ed.2d 374
(2000); CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 670-71, 113 S.Ct.1732, 123 L.Ed.2d
387 (1993). In Easterwood, the United States Supreme Court explained:

 In short, for projects in which federal funds participate in the installation of
warning devices, the Secretary has determined the devices to be installed and
the means by which railroads are to participate in their selection. The
Secretary's regulations therefore cover the subject matter of state law which,
like the tort law on which respondent relies, seeks to impose an independent
duty on a railroad to identify and/or repair dangerous crossings. 


Easterwood, 507 U.S. at 671. 

 Subject to the provisions contained in 23 U.S.C.A. § 130, Congress authorized the
expenditure of federal funds for projects to eliminate hazards at railway-highway crossings.
23 U.S.C.A. § 130 (West 2002 & Supp. 2009). To participate in the program, States are
required to "conduct and systematically maintain a survey of all highways to identify those
railroad crossings which may require separation, relocation, or protective devices, and
establish and implement a schedule of projects for this purpose." Id. § 130 (d) (West 2002). 
The schedule "shall provide signs for all railway-highway crossings." Id. The Secretary of
Transportation has promulgated a regulation designed to implement projects under the
program, including section 642.214(b) of title 23 of the Code of Federal Regulations, which
addresses the design of grade crossing improvements. (3) Ultimately, in Easterwood, the Court concluded that the personal injury claim that arose under state tort law had not been
preempted by 23 C.F.R. § 646.214 because the facts did "not establish that federal funds
'participated in the installation of the [warning] devices[.]'" Easterwood, 507 U.S. at 672. 
In Shanklin, decided in 2000, the United States Supreme Court noted that in Easterwood, it
had held that "§§ 646.214(b)(3) and (4) pre-empt state tort claims concerning the adequacy
of all warning devices installed with the participation of federal funds." 529 U.S. at 357. 
As explained by the Supreme Court, "Whether the State should have originally installed
different or additional devices, or whether conditions at the crossing have since changed such
that automatic gates and flashing lights would be appropriate, is immaterial to the pre-emption question." Id. at 358. 

 Thus, in the case before us, the threshold question is whether UP conclusively
established that federal funds participated in the installation of the crossbucks at the 
crossing. UP argues that the trial court record demonstrates:

 (1) the Horridge Street project was a federally funded project, and it included
the closure of the Eddy Street crossing; (2) the LDOT later authorized UP to
use $10,000 from the Horridge Street project to install a new crossing at Eddy
Street with crossbucks; (3) the FHWA (4) was involved in the planning process
with the LDOT to reopen the Eddy Street crossing, and was copied on the
LDOT's letter authorizing the use of $10,000 in federal funds; (4) the LDOT
and UP executed a Change Order Authorization for submission to the FHWA;
and (4) UP installed the crossbucks a few weeks later.

 In its brief, UP references the Eddy Street grade crossing file introduced during trial
as evidence showing that federal funds participated at the crossing. The grade crossing file
includes notes apparently taken by LDOT's representative of a meeting between LDOT and
the FHWA at the end of April 1997. The notes reflect a discussion about the closure of the
crossing. At that time, the note shows that the planned course was to keep the crossing
closed. By the end of June 1997, however, an e-mail by UP's employee acknowledges UP's
receipt of a letter from the City of Vinton and LDOT ordering the reinstallation of the
crossing at Eddy Street. The e-mail directs other UP employees to reopen the crossing. 
Specifically, the e-mail expressly states: "The State authorized work up to $10,000." With
respect to warnings, the e-mail mentions that UP was required to install crossbucks. Finally,
the crossing file further reflects that on December 2, 1997, UP submitted a Change Order
Authorization to LDOT to cover "the reinstallation of an un-authorized closed crossing at the
above mentioned location."

 Our review of the grade crossing file does not lead us to the conclusion that UP
conclusively proved that federal funds participated in the reopening of the crossing. For
instance, the grade crossing file does not reflect that federal officials inspected and approved
the signalization for the project to reopen the crossing, or that federal officials approved or
agreed to pay for the erection of crossbucks required as a result of the State's failed attempt
to permanently close the crossing. Importantly, the crossing file also does not reflect that the
State succeeded in utilizing federal funds previously approved for a project that encompassed
closing the crossing to instead pay for the expenses incurred by UP to reopen it. Finally,
while officials of the federal government were apparently notified of the plan to reopen the 
crossing as a passive crossing with crossbucks and stop signs, UP's grade crossing file does
not reflect that federal officials approved its reopening without active warning devices.

 UP also relied on the affidavit of David Peterson (5) to establish that federal funds were
"expended in the installation of the reflectorized crossbucks at the Eddy Street crossing." 
Peterson, whose affidavit states that in 1997 he was employed by UP as the Regional
Manager of Industry and Public Projects, briefly describes the closing and subsequent
reopening of the crossing. With respect to payment on the project to reopen the crossing,
Peterson's affidavit states:

 This work was completed and Union Pacific charged the cost associated with
reopening the Eddy Street crossing including the cost for the placement of the
crossbucks to State Project No. XXX-XX-XXXX/FAP No. STP-000S (370). 
Union Pacific was reimbursed for the work. The reimbursement was funded
with Federal funds. 


However, Robert Kenneth Rouse, another UP witness who testified at trial and who
apparently became UP's Senior Manager for Industrial and Public Projects in 1997, also
testified about the $10,000 that the State authorized under the Change Order Authorization. 
Although Rouse testified that he assumed from the authorization that the money included the
payments to reinstall the crossbucks, on cross-examination, Rouse also testified that he had
no knowledge about whether federal funds were used to reinstall them. The record also
contains Rouse's e-mail that he sent in reply to an e-mail by another UP employee notifying
Rouse of Ardoin's accident. In his reply e-mail, Rouse stated: "There were no Federal Funds
used in the recent UP cross buck renewal program in Louisiana. However, federal funds may
have been used on the cross bucks that were replaced." Finally, the UP employee that
notified Rouse by e-mail of the accident stated in his e-mail, "The crossing has cross bucks
which were replaced in the program about 18-24 months ago. I understand NO Federal
Funds were involved. Please confirm." Thus, Peterson's affidavit is not free from
contradictory evidence that is in the complete trial record. 

 Testimony of an interested witness is generally not sufficient to conclusively establish
a disputed fact. "The general rule is that evidence given by an interested witness, even
though uncontradicted, presents an issue to be determined by the jury." McGuire v. City of
Dallas, 141 Tex. 170, 170 S.W.2d 722, 728 (1943). An exception to this general rule exists
"only if the testimony could be readily contradicted if untrue, and is clear, direct and positive,
and there are no circumstances tending to discredit or impeach it." Lofton v. Tex. Brine
Corp., 777 S.W.2d 384, 386 (Tex. 1989). 

 From Peterson's affidavit, it appears that his knowledge concerning the source of the
funds used at the crossing came from his review of UP's operating file on the crossing, which
is included in the record and is attached to Peterson's affidavit. Based on the work
authorization requests contained in UP's Eddy Street crossing file, it further appears that UP
submitted its requests for payment to the State; thus, UP's witnesses may not have had
personal knowledge of whether the State actually obtained federal funds on the project to
reinstall the crossbucks. For example, while the operating file refers to the State's
authorizing funds to reopen the crossing, the file does not reflect that federal officials
approved the use of federal funds or that federal funds participated in the reopening of the 
crossing. 

 Thus, the circumstances tend to discredit or impeach the contention that Peterson
possessed personal knowledge about whether federal funds had been used to reopen the
crossing. Rouse, who appeared at trial and apparently held the same position with UP as
Peterson did on the date Peterson signed his affidavit, also reviewed the UP crossing file, but
later testified he had no personal knowledge about whether federal funds were used at the
crossing. 

 Based on the entire trial record, with respect to UP's preemption argument, we
conclude that whether federal funds participated in the reopening of the crossing was not
conclusively proven. Although UP requested a submission of a preemption issue to the jury,
the court did not submit UP's proposed charge. (6) Having considered UP's argument and all
of the evidence, we hold that UP did not establish its preemption defense as a matter of law. 


 In summary, and with respect to UP's arguments that we should render judgment on
its behalf, we hold there was legally sufficient evidence that UP owed the traveling public
a duty to make the crossing reasonably safe and that UP had a duty to request any permission
it believed it needed to erect additional warnings at the crossing. We further hold that UP
failed to meet its burden on appeal to establish federal preemption as a matter of law. 
Therefore, we overrule all of UP's arguments that request a rendition in its favor. 

Venue

 UP asserts that this case should be transferred to Harris County, the location of its
principal office in Texas, and that Jefferson County was not a county of proper venue for this
lawsuit. In considering whether venue was or was not proper, the Texas Legislature has
directed appellate courts to "consider the entire record, including the trial on the merits." 
Tex. Civ. Prac. & Rem. Code Ann. § 15.064(b) (Vernon 2002). "[I]f venue was improper,
it shall in no event be harmless error and shall be reversible error." Id. Additionally, if
venue was improper and there is probative evidence that venue is proper in the county to
which transfer had been sought, "the appellate court should instruct the trial court to transfer
the case to that county." Ruiz v. Conoco, Inc., 868 S.W.2d 752, 758 (Tex. 1993). 

 Texas statutes generally govern the plaintiff's initial choice of the proper county in
which to file a claim, and in cases involving multiple defendants, Texas law provides: "In
a suit in which the plaintiff has established proper venue against a defendant, the court also
has venue of all the defendants in all claims or actions arising out of the same transaction,
occurrence, or series of transactions or occurrences." Tex. Civ. Prac. & Rem. Code Ann.
§ 15.005 (Vernon 2002). In this case, which involves multiple defendants, the claimants
asserted that venue was proper in Jefferson County against UP because venue was proper
against a co-defendant, Mann. 

 After UP had been served with Plaintiffs's Original Petition, it filed a motion
requesting the trial court transfer the case to the county in which its principal offices were
located, Harris County. The trial court denied UP's motion to transfer venue on July 21,
2006. When the trial court ruled on UP's motion to transfer venue, Mann had not yet been
named as a defendant. Moreover, claimants do not argue that they had named another
Jefferson County resident that, at the time of the venue hearing, established proper venue in
Jefferson County.

 Mann appeared as a party when he filed his answer to Plaintiff's Fifth Amended
Petition on June 14, 2007. The claims against Mann at the time of trial alleged negligence,
and essentially consisted of the following: 

 Mr. Mann investigated four accidents at the Eddy Street Crossing. Although
he knew that this was a crossing that needed to be examined for upgrades or
closure, Mr. Mann remained silent about the problems at the Eddy Street
crossing until after the tragedy made the basis of this lawsuit took place. 


UP's and Mann's Amended Original Answer, filed September 14, 2007, were their live
pleadings at the time of trial and consist of a general denial and several affirmative defenses. 
After the claimants rested their case, Mann's attorney moved for an instructed verdict,
arguing that Mann had no duty to Ardoin under either Texas or Louisiana law. See Tex. R.
Civ. P. 268. On the following morning, the trial court granted Mann's motion. The
claimants have not appealed from the trial court's instructed verdict.

 In response to Mann's motion for directed verdict, the claimants argued to the trial
court that by investigating prior accidents, Mann undertook a duty to do so reasonably. In
support of that argument, the claimants relied on a UP policy from UP's "Grade Crossing
Resource Manual," which contains a statement that UP employees at all levels are to "take
responsibility for making observations, reporting unsafe conditions, and maintaining safe
grade crossings." In response to UP's venue arguments, the claimants also rely on the trial
testimony of Archie Burnham, their crossing-safety expert, who testified that Mann had
investigated the prior accidents and if there were obvious deficiencies at the crossing, Mann
could have made recommendations about them to UP. Mann was not called as a witness at
trial.

 The claimants cite no Texas or Louisiana cases in support of their argument that an
employee's failure to comply with a company policy allows a member of the public to sue
the employee individually. Mann was not alleged to own or control activities that occurred
at the crossing, and there was no evidence that he did so. Thus, Duncan's duty analysis does
not logically extend to Mann. See Duncan, 773 So. 2d at 675. Syrie, in our opinion, contains
the framework to analyze whether an individual owes a duty to the traveling public under
Louisiana law. See Syrie, 693 So. 2d at 1177 (relying upon a State trooper's power to
regulate traffic at the time of the incident in reaching the conclusion that the trooper owed
a duty to motorists on the highway). There is no evidence in the record that Mann had the
power to cause UP to erect warnings at crossings. 

 UP's policy manual does not contain a general delegation of power to UP employees
that provide its employees with control of activities at railroad crossings, such as the power
to erect gates and lights. In its most favorable light, the claimants' evidence established, at
most, that the policy required railroad employees to report unsafe conditions, which is
different than the power to control traffic that formed the basis of the trooper's duty in Syrie. 
See id. Generally, Louisiana has imposed the duty to control safety warnings erected at
crossings only upon the crossing's owner. See generally Long, 916 So. 2d at 103. We have
found no Louisiana case holding that a railroad claims investigator, who is subject to an
employment policy encouraging the reporting of unsafe conditions, to have a duty to the
traveling public, and we find no legal basis to do so here.

 Texas law would also not impose a duty on a claims investigator for a railroad under
circumstances similar to those present here. Under Texas law, whether a duty exists is a
question of law for the court. Humble Sand & Gravel, Inc. v. Gomez, 146 S.W.3d 170, 181
(Tex. 2004); Tex. Home Mgmt., Inc. v. Peavy, 89 S.W.3d 30, 33 (Tex. 2002); SmithKline
Beecham Corp. v. Doe, 903 S.W.2d 347, 351 (Tex. 1995). In Leitch v. Hornsby, the Texas
Supreme Court explained when individual liability will be imposed on a corporate officer and
when it will not. 935 S.W.2d 114, 117 (Tex. 1996). The Court stated the rule as follows:
"[I]ndividual liability arises only when the officer or agent owes an independent duty of
reasonable care to the injured party apart from the employer's duty." Id. In Leitch, the Texas
Supreme Court concluded that the company's officers were not individually liable for the
failure to supply a lifting belt or dolly to the plaintiff, a company employee, who was injured
when he lifted a sixty-five-pound reel of cable. Id. at 116-18. The Court explained that the
officers were not individually liable because they "had no individual duty as corporate
officers to provide [the plaintiff] with a safe workplace." Id. at 118. The Court reached this
conclusion despite finding that the company did owe the employee a duty to provide a safe
place to work, but explained that the company's officers, as individuals, did "not owe a
corporate employee an individual duty to provide that employee with a safe work place[.]" 
 Id.

 After reviewing the entire record before us, we conclude that based upon Mann's
employment as a claims investigator, Mann did not individually owe a duty to members of
the traveling public to provide warnings at UP's crossings. Consequently, Mann, the sole
defendant alleged to reside in Jefferson County, is not a proper venue defendant. 

 In their brief, the claimants do not contradict UP's allegation that proper venue of this
case existed in Harris County, the location of UP's principal place of business in Texas. See
Tex. Civ. Prac. & Rem. Code Ann. § 15.002(a)(3) (Vernon 2002). In addition, in their
original pleading, stating where UP could be served, the claimants alleged that UP's general
solicitor could be served in Harris County. 

 Because trial in a county of improper venue is never harmless error, we conclude that
UP is entitled to have the trial court's judgment awarding damages against it reversed, and
venue of the claims brought against it transferred to Harris County, Texas. See id. §
15.064(b); Ruiz, 868 S.W.2d at 758. We therefore reverse the trial court's judgment against
UP, but we affirm the trial court's judgment denying relief against all other defendants. We
remand the cause to the trial court with instructions that the trial court instruct the district
clerk to transfer this file to the District Clerk of Harris County, Texas.

 AFFIRMED IN PART; REVERSED AND REMANDED IN PART WITH
INSTRUCTIONS TO TRANSFER VENUE TO HARRIS COUNTY. 


 ___________________________

 HOLLIS HORTON

 Justice



Submitted on April 2, 2009

Opinion Delivered July 16, 2009

Before McKeithen, C.J., Kreger and Horton, JJ.
1. According to the testimony in this case, a wigwag is a "flashing roundel that moves
back and forth when activated by the approach of the train." According to Wikipedia, a
"[w]igwag is the nickname given to a type of early, North American, 20th century, railroad
grade crossing signal, so named due to the pendulum-like motion it used to signal the
approach of a train. It is generally credited to Albert Hunt, a mechanical engineer at Southern
California's Pacific Electric (PE) interurban streetcar railroad, who invented it in 1909 out
of the necessity for a safer railroad grade crossing." Wikipedia, the Free Encyclopedia,
Wigwag (railroad), at http://en.wikipedia.org/wiki/Wigwag_(railroad) (last visited June 19,
2009). 

2. The parties have not addressed whether state law duties are preempted by federal law
at a railroad crossing that is not part of a state highway system. For purposes of our
resolution of the preemption issues, we have assumed without deciding that federal
preemption would apply to this crossing had UP conclusively proven that federal funds
actually participated in the warnings present at the time of Ardoin's collision.
3. Section 646.214(b) of title 23 of the Code of Federal Regulations provides:


§ 646.214 Design. 


 (a) General. (1) Facilities that are the responsibility of the railroad for
maintenance and operation shall conform to the specifications and design
standards used by the railroad in its normal practice, subject to approval by the
State highway agency and FHWA.


 (2) Facilities that are the responsibility of the highway agency for maintenance
and operation shall conform to the specifications and design standards and
guides used by the highway agency in its normal practice for Federal-aid
projects.


 (b) Grade crossing improvements. (1) All traffic control devices proposed
shall comply with the latest edition of the Manual on Uniform Traffic Control
Devices for Streets and Highways supplemented to the extent applicable by
State standards.


 (2) Pursuant to 23 U.S.C. 109(e), where a railroad-highway grade crossing is
located within the limits of or near the terminus of a Federal-aid highway
project for construction of a new highway or improvement of the existing
roadway, the crossing shall not be opened for unrestricted use by traffic or the
project accepted by FHWA until adequate warning devices for the crossing are
installed and functioning properly.


 (3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project
where Federal-aid funds participate in the installation of the devices are to
include automatic gates with flashing light signals when one or more of the
following conditions exist: 


 (A) Multiple main line railroad tracks. 


 (B) Multiple tracks at or in the vicinity of the crossing which may be occupied
by a train or locomotive so as to obscure the movement of another train
approaching the crossing.


 (C) High Speed train operation combined with limited sight distance at either
single or multiple track crossings.


 (D) A combination of high speeds and moderately high volumes of highway
and railroad traffic.


 (E) Either a high volume of vehicular traffic, high number of train movements,
substantial numbers of schoolbuses or trucks carrying hazardous materials,
unusually restricted sight distance, continuing accident occurrences, or any
combination of these conditions.


 (F) A diagnostic team recommends them.


 (ii) In individual cases where a diagnostic team justifies that gates are not
appropriate, FHWA may find that the above requirements are not applicable.


 (4) For crossings where the requirements of § 646.214(b)(3) are not applicable,
the type of warning device to be installed, whether the determination is made
by a State regulatory agency, State highway agency, and/or the railroad, is
subject to the approval of FHWA.


 (c) Grade crossing elimination. All crossings of railroads and highways at
grade shall be eliminated where there is full control of access on the highway
(a freeway) regardless of the volume of railroad or highway traffic.


23 C.F.R. § 646.214, LEXIS 23 CFR 646.214.
4. Federal Highway Administration.
5. In its preemption argument, UP complains that after it rested, the trial court granted
the claimants' request to strike Peterson's affidavit from evidence. Although the trial court
admitted the exhibit, it later changed course and decided to exclude it. In light of our
conclusion that the affidavit does not conclusively establish that federal funds were used at
the crossing, we need not further address whether the trial court abused its discretion in 
excluding it from evidence after having previously admitted it into evidence. 
6. In light of our resolution of the venue issue, we do not reach several issues raised by
UP concerning the jury charge; however, we note that while UP's preemption issue was
among issues it asked to be submitted to the jury, UP's appeal does not include any complaint
concerning the trial court's refusal of its preemption issue that would have resolved any
factual dispute about whether federal funds were used to reinstall the crossbucks at the 
crossing.