In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

## NO. 09-23-00406-CV

_____

## PRABHAT KUMAR AND POONAM GUPTA, Appellants

## V.

## T.D. COX HOMES LLC, Appellee

**On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 22-08-10731-CV**

## MEMORANDUM OPINION

In this landlord-tenant dispute, Appellants Prabhat Kumar ("Kumar") and Poonam Gupta ("Gupta") sued T.D. Cox Homes, LLC ("Cox" or "Appellee") for damages allegedly stemming from the "uninhabitable" condition of the house they rented from Cox and Cox's failure to return their security deposit. Kumar and Gupta (collectively "Appellants") alleged claims for breach of contract and violations of

1

the Texas Property Code and Texas Deceptive Trade Practices Act (DTPA).[1] *See* Tex. Bus. & Com. Code Ann. §§ 17.41-.49; Tex. Prop. Code Ann. §§ 92.052(a)(3)(A), 92.104. Both parties sought attorney's fees.

The parties tried the case to the court, which found in Cox's favor on all issues and entered Findings of Fact and Conclusions of Law. Appellants appealed, alleging multiple errors on the part of the trial court. We affirm the trial court's judgment.

## BACKGROUND

During the 2021 winter freeze, Appellants' home flooded due to broken water pipes. The extent of the damage prevented Appellants from living in the house while the damage was repaired, so they sought to rent a house temporarily. Appellants viewed the house that is the subject of this case, agreed that it met their needs, and then signed a lease. The lease covered the period of March 25, 2021, through March 31, 2022, and provided for a monthly rent of $2,500. The lease also provided for a $2,500 security deposit. The lease provided that (1) "Landlord may deduct reasonable charges from the security deposit for: (1)(a) damages to the property[;]" (2) "Landlord makes no express or Implied warranties as to the Property's condition. Tenant has inspected the property and accepts it **AS-IS** [;]" and (3) the parties agreed to receive notices under the lease by email.

---

[1]Appellants dropped their DTPA claim during trial.

2

Appellants moved into the house on or about March 25, 2021, and soon requested repairs as set forth below in Kumar's emails to Cox. Cox responded to these requests.

On June 16, 2021, there was a sewage backup at the property. This backup affected the ground floor of the house, including the master bedroom and bathroom, kitchen, living room, powder room, garage, and two closets, and triggered this suit. We summarize the evidence below.

Prabhat Kumar's Testimony

Kumar testified that he and his wife, Gupta, rented the subject house while their own home's water damage was being repaired. They also rented some of the furniture.

When Appellants moved into the property, they noted that "[t]here were no blinds/curtains in the bedrooms," and that the stove and some of the "electrical switches" were not working. Kumar reported these issues to Cox through its realtor. When Appellants later observed other issues, including "signs of water leakage" in the master bedroom, and an inoperable doorbell, Kumar reported these problems to Valerie, Cox's office manager. Valerie responded that since Cox had recently purchased the house and planned to raze and rebuild it after using it as a temporary rental, she did not know a lot about the property. Kumar acknowledged that Cox sent

3

"people" to fix the problems he reported but stated that as soon as one thing was repaired, something else broke.

On June 16, 2021, Gupta called Kumar at work, stating that "some bad smell is coming. And the first floor, both toilets, see this dirty water is coming out of those, and there is no way to stop that, you know. It's continuously out flowing all over the house." Kumar then called Cox and went to the house, where he saw the problem Gupta had described. Although the plumber Cox sent to the house worked "almost six hours[,]" the "smell was increasing" so Appellants and their family members spent the next few nights at hotels. They then went to Mexico, and when they returned, they moved into a house owned by Appellants' daughters at a cost of $6,800 per month, which was later increased to $8,000 per month to include furniture. Moving Appellants' belongings to their daughters' house cost $750, which Kumar billed to his company.

Kumar testified that although he and Gupta looked at the house before leasing it, they "really did not give that much attention[,]" since they were in a rush to find a place to live. Kumar denied that he or anyone staying at the Cox property flushed wipes down the toilet. Kumar did, however, concede that although he paid Cox the $2,500 security deposit, he did not pay rent at either temporary housing location, since the rent was being paid by his insurance company. Kumar also acknowledged

4

that he rented the house as-is, and that the lease did not show his forwarding address, and that Cox diligently tried to repair the toilet overflow.

Kumar testified that he and Gupta planned to move back into the property but were unable to do so because the repairs took longer than anticipated. He recalled that he made the decision to move out of the house "[a]fter a couple of days[,]" but when asked about his June 16, 2021 email stating "I have no other choice except to cancel the lease and look for a new home[,]" Kumar characterized the statement as a "[t]hreatening call to her that I will cancel this, you know, if you couldn't do it." Kumar also agreed that he wanted to terminate the lease and that Ms. Kushto, the relocation specialist, requested on Kumar's behalf to terminate the lease, and that Cox agreed to do so.

Kumar testified that Cox withheld the security deposit due to Cox's plumbing repair costs, and Kumar stated that Cox "had my address[,]" but admitted that he never provided Cox with written notice of his forwarding address for the purpose of refunding his security deposit.

Documentary Evidence

Appellants' and Appellee's Exhibits contain email threads and other documentation demonstrating how the relevant events unfolded.

Kumar:  Dear Tammy/Bill,
        Hello, we went to check the home and did not find the following:-
        Washer Dryer (was not advertised with washer/dryer)

5

Blinds/curtains in bed rooms (Tom Cox's office has some rods and curtains that you might be able to use. They were removed when the painting was done)

Garage openers (Landlord is working on getting you some)

Internet/cable (Service provider is your choice. It's not included in rent)

Please check from Landlord to advise if he is going to take care of any of it or not.

March 25, 2021, 8:12 p.m.

Cox:    Good Morning, Prabhat, please see below responses to your questions. Also, there are extra keys at Tom Cox's office at [address]. If you want to pick up today, please call Bob at [number] to make sure he's there. Valerie is not there today. The keys are on the reception desk with a yellow tag.

The lease was accepted as is. Window coverings should have been discussed prior and we could have incorporated into the lease if landlord approved. We are sorry for any misunderstanding.

March 26, 2021, 1:40 p.m.

Kumar:    Tammy,

Hello, it seems this home is very special. Gas/cooking range does not work? To whom we complain as we do not have Landlords number. There is no microwave oven? Of Course there are no blinds/curtains in this home on bedroom windows. When you rent a home, you expect some basic things such as above. I do not know without a cooking range how long we can stay here. Still no garage opener is delivered to us. I did not see the bathroom, any curtains were there. Can we buy and get it installed? De we have permission from the landlord on it?

March 30, 2021, 6:48 p.m.

Cox:    Sorry for the confusion/frustration with the house so far. The shut off for the stove might be turned off and we can come by and check that tomorrow. Regarding the extra set of keys and garage door opener we were under the impression someone would be coming by our office to pick them up. They are sitting on the front desk in our reception area. We can deliver those tomorrow as well. You guys are more than welcome to install curtains or blinds on the windows, we have no issue with this at all. I can

6

talk with Tom tomorrow regarding the microwave as there wasn't one there when we bought the house and honestly no one of had realized there wasn't one there until you just made note of it. I'm assuming a simple countertop microwave would work? Please feel free to reach out to me with any additional questions or concerns.

March 30, 2021, 7:22 p.m.

Kumar:   Valerie,[2]

Thank you for same.

Please do turn on tomorrow the cooking range as we tried all and could not figure out. Countertop Microwave is okay. Please do deliver additional keys and garage openers. There are spiders in tubs and some places wall paper is coming out.

March 30, 2021, 9:19 p.m.

Kumar:   Valerie,

Hello, please note the following has been noticed in your home.

1. The Main DoorBell is not working.
2. Master BedRoom closet has sign of water leakage and it seams floor in that is slightly uneven.
3. In the backyard of the home in Patio, one of the wooden plank is broken.
4. Some places electric plugs/points are not working.

Above is for your information.

Furthermore, in our opinion, no rent should be charged for 7 days last month as most things were not in order at home as we got gas connection on 31st late evening only, which should have been there on the very first day. We prefer to have one more remote controller for the car garage.

April 4, 2021, 4:07 p.m.

Cox:   The electrician should be contacting you to come take a look at the doorbell and see what is going on. Regarding the plugs not working I think some of them are operated by a switch. The electrician can check this out as well when he's there.

---

[2]Valerie is Cox's office manager.

Just some background on this house as I did speak with your wife this last week when we were there. We bought this house with the understanding we would tear it down and rebuild a new house, therefore I don't know a lot of the ins and outs of the house. We did do some repair work and touch ups so we could use it as a temporary rental until we are ready to tear it down. Your wife showed me some of the places were the wallpaper was coming lose and other items like that as she indicated that she wanted to make sure that we knew there were issues. Not that she wanted them fixed but just so we knew they were there before you guys moved in and also so we knew that you guys planned to take care of the house. I know there are defects with the house but they seem to be cosmetic stuff and if you are just letting me know so we are aware that is fine. If there are major issues that should arise please feel free to let me know so we can address it in a timely manner.

Regarding the utilities normally this is a tenants responsibility to handle. However I did state that we could keep the utilities in our name so it was easier for everyone and they were already established. We would be sending the invoices via email once a month for a reimbursement from you guys. I never heard back from anyone on this to make sure this was the plan but I assumed that is what we are doing. In reference to CenterPoint, the gas, I have no idea what happened with the gas as it has been on this whole time. As soon as you made me aware that there was an issue I called them and even paid a rush fee to get them back out there the same day to get that corrected for you guys.

We only received 1 remote for the garage door when we bought the house so that is all I have to give you guys.
April 5, 2021, 10:35 a.m.

Kumar:     Valerie,
Hello, we have not been contacted by your electrician till now. DoorBell and many switches are not working. Please check on it and advise. We all wanted you to know several shortcomings in this house and it should not be the reason to refund our security deposit at the time of vacating your place. Please keep a note of thee same.

8

April 12, 2021, 2:29 p.m.

Cox: Can you please let us know when you would be available as the electrician tried calling earlier with no answer?
April 15, 2021, 4:26 p.m.

Kmar: Hello, we did not receive any calls from anyone. We are available here today and tomorrow most of the day.
April 15, 2021, 5:56 p.m.

Cox: Bruce said he will reach out again tomorrow, hopefully they can get by there. He called and so did the electrician today. I will double check the number with them I the morning to make sure it wasn't a typo.
April 15, 2021, 7:14 p.m.

Cox: Just circling back around on this to try to get everyone in touch. Here is Bruce's number so you can call him and get something setup as I believe you guys haven't been able to meet up. [number].
April 20, 2021, 11:00 a.m.

Cox: Please remit payment for the attached utility bill. This will be the only bill for this month and I split the cost as that is the way the billing cycle works out.
April 27, 2021, 11:56 a.m.

Kumar: Valerie,
How do you want us to pay?
The refrigerator does not make any ice or provide water from the water/ice dispenser.
Do you know how it works or send someone to fix it?
April 28, 2021, 6:57 p.m.

Cox: You can just mail us a check at the address listed below in my signature line.

Regarding the fridge, the installer didn't know where the water line hookup was so he didn't hook it up. I am not sure if there is one but we could always come by and take a look. I need to know

9

some dates and times that would work so I could send someone by.
April 28, 2021, 10:05 p.m.

Kumar: Valerie,

Hello, there is a water connection besides the fridge in a side cabinet. It may be for the fridge only. Any day and time is fine with us.
May 3, 2021, 9:29 a.m.

Cox: I have let Bruce know and he will get by there just as soon as he can.
May 4, 2021, 2:24 p.m.

Kumar: Valerie,

Hello, sorry to bother you again but AC is not working since yesterday. Living without AC is difficult. Please see what can be done urgently. Bruce is yet to contact us.
May 9, 2021, 6:06 p.m.

Cox: I will get in touch with out ac company first thing tomorrow and get them out there. I sent a message to Bruce about the water line for the fridge.
May 9, 2021, 7:58 p.m.

Kumar: Valerie,

Hello, no one came so far today to look for AC and Fridge. AC is important, can you arrange someone to visit today.
May 10, 2021, 3:19 p.m.

Cox: The AC guy is scheduled to come today between 3 and 5. So just keep an eye out for him.
May 10, 2021, 3:29 p.m.

Cox: I have attached this month's current utility bills along with the one from last month. I don't show I ever received the reimbursement on that one. The total due to us for both months is $165.95. Please send this as soon as you can. You can either drop it off at our office at [address] or mail it to us at the PO Box listed below.

10

May 25, 2021, 1:15 p.m.

Kumar:          URGENT URGENT

Hello, both the bathrooms, water is flowing back in your home.
I think you need to send a plumber right away.
There is no response from your phone.
June 16, 2021, 3:18 p.m.

On June 16, 2021, at 4:45 p.m. Plumbers from New Tex Plumbing were dispatched to Appellants' residence, arriving at 5:15 p.m. They left at 9:20 p.m. They noted that there was a root in the sewer, no cleanouts, and that they would need to get a locater and schedule additional work.

Kumar:          Valerie,
Hello, the water leakage continues in spite of the plumber working to fix for the last many hours. The both bathrooms water continues to flow back and being dirty water it is smelling too. The home does not have any outer Cleanout and as per plumber How come such a home has been given for residential purposes when the same does not meet various city codes. This house was neck in pain from day one such as gas was not in operation, air conditioning not working properly, no water connection to refrigerator. Light switches/plugs not aligned etc. etc. and now proper drainage.

Plumbers will come tomorrow with some big machines to resolve the problem but not sure, they could do it since this home does not have any outer cleanout. You have already spoken directly to the plumber who confirmed the same.[3] As per him, we should not use any toilets or any water at home until the problem is fixed otherwise this home can be flooded with dirty toilet water, So we need to move right now to a hotel until the issue is resolved.

---

[3]Other evidence showed that the house did have a cleanout.

> My family is tired of all such issues and on complaining to you, you simply say this is a given temporarily on rent but after lease it will be torn off.
>
> In view of the above, I have no other choice except to cancel the lease and look for a new home as it is unsafe to live in a home not built/rented according to the city codes.
>
> Jeanette/Jessica,[4]
> Sorry to bother you again but we have no other choice except to move out of this place as it is not safe to live anymore. I hope you will support us in the same.
> June 16, 2021, 7:57 p.m.

Cox:   I am sorry you guys are having these issues and we are working on getting this fixed for you just as quick as possible. June 17, 2021 email from Cox (9:30 a.m.)

On June 17, 2021, Roto-Rooter wrote an Excavation Proposal. The proposal

states:

> Line inspection through pulled toilet found hard stoppage and no visible cleanout access.
>
> Solution:
> Exploratory excavation. Tunnal below slab to hard stoppage and replaced brokn or compromised drain lines with sch[edule] 40 PVC connect to existing line and backfill.
>
> Due to us not being able to see past the stoppage additional work may be needed beyond that point.

On June 17, 2021, Roto-Rooter performed a video inspection of the sewer line

and generated the following report:

---

[4]Jessica Kushto is the relocation specialist retained by Appellants' insurance company. The trial court found that she acted as Appellants' agent.

Hard stoppage approx.[imately] 50' outbound through pulled toilet[.]"
Roto-Rooter's proposed solution is the same as previously shown.

Appellants' Exhibit 22 contains multiple photographs showing the house before, during, and after Roto-Rooter's work.

Kumar:    Valerie,
          Hello and thank you for your support.
          Your home was getting flooded with dirty toilet water yesterday.
          Your plumber worked on it for about 6 hours but was unable to
          fix it. My family consisting of me, my wife, 2 daughters and 2
          grandchildren were not allowed to use toilets and were waiting
          to see if it can be fixed. Finally your plumber said, you guys
          should move out as it is not safe and then we moved into the
          Marriott hotel nearby about 9 pm. However, there was no
          solution that came back from your side. So far we have no news
          when plumbers will be back today.

          I am sorry I can not risk the health & safety of my children and
          grandchildren especially when your home was not built to
          minimum standards required and can get flooded with water any
          time. We were ignoring or getting things repaired at our cost in
          your home without bothering you as calling you for every issue
          does not look nice. This current issue is serious and for health
          and safety reasons we must moved out and support is needed in
          the same. Please note it is a pain for all our family as moving
          from one house to another is not easy.
          June 17, 2021, 10:05 a.m.

Cox:      Jessica,
          Letting everyone know, we have plumbers at the house working
          and also a restoration company coming to clean carpet. It will
          take a couple of days to have everything fixed Will update when
          we know more.
          Thank you!
          June 17, 2021, 1:05 p.m.

Kushto: Hello Everyone,
I received a call from Mr. Kumar. He said he spoke to Bob and Valerie at the rental who told him they agree to break the lease with no penalties or being rent obligated to the end of the lease term. We currently have rental paid to 6-30-21.

Can you confirm if Mr. Kumar is able to break the lease? Also, will we be reimbursed for rent from 6-17-21 to 6-30-21?
June 17, 2021, 1:53 p.m.

Can you confirm if Mr. Kumar is able to break the lease? Also, will he be reimbursed for rent from 6-17-30 to 6-30-21?
June 17, 2021, 2:30 p.m.

Hello Everyone,
I received a call from Mr. Kumar. He said he spoke to Bob and Valerie at the rental who told him they agree to break the lease with no penalties or being rent obligated to the end of the lease term. We currently have rental paid to 6-30-21

Can you confirm if Mr. Kumar is able to break the lease? Also, will we be reimbursed for rent from 6-17-21 to 6-30-21?
June 17, 2021, 2:53 p.m.

Cox: We are fine with them moving out. However, we can't issue a refund to them for rent. From what we are finding out about this plumbing mess is they have been flushing wipes down the toilet and that is what is causing the blockage, As of this morning the main living area and master bedroom flooded due to water backing up and we had to hire a remediation company. We are now going to have to spend close to $20k to remedy this problem. There were wipes that were pumped out of the line and we have photos of it. In addition to that we understand that only Mr. Kumar and his wife were to be living in the home as they were the only ones noted on the lease. There are at a minimum of at least 6 people living in the house that we know of as of today. I am sorry that this didn't work out but now we are left with a huge mess and a very large bill to cover to fix it.[5]

---

[5]Cox's insurance company paid $10,000 of the repair costs.

14

June 17, 2021, 7:44 p.m.

Kushto:      Hi Valerie,
             Can you please provide a signed letter stating you (T.D. Cox
             Homes, LLC) are releasing Mr. Kumar from his lease agreement
             as of 6-30-21?
             June 18, 2021 email

Cox:         Letter stating:
             We agree to release Prabhat Kumar and Poonam Gupta from the
             lease at [address] effective June 30, 2021. Also please note that
             there will be final utility bills that will need to be paid. Once we
             receive them I will send them via email for reimbursement.

             The letter is signed by Cox's office manager.
             June 21, 2021

Appellants' Exhibit 8 is a June 24, 2021 invoice from Tejas Movers to

American Comp Tools in the amount of $750.

Kumar:       Valerie,
             Hello, this is to inform you that by today we moved everything
             from the home. It costed us several hundred dollars in moving
             our things from this plus loss of several items again. Since 16th
             June we have been living in one or another hotel and still
             searching for a suitable home on lease to live in until our home
             gets ready. Please advise when I can collect our security deposit
             and any support in payment of hotel and movers expanses.

Cox:         I have attached the utility bills that we will need reimbursement
             for. Regarding the security deposit I am waiting to hear back
             from the repair company before we make any final decisions on
             that. From what we were being told, and I had explained to
             Jessica in a previous message the reason for the sewer backup
             was due to wipes being flushed down the drain. There were even
             wipes they had flushed out of the pipe and we have pictures of
             that. It will cost us over $20K to make the needed repairs to this
             house and we already said that we would let you guys break the

lease so I am not really sure how we can justify any return of monies to you.
June 29, 2021, 12:37 p.m.

Kumar:      Valerie,

Hello, will pay 27.01, however we are surprised to receive your explanation and trying to put the blame on us specially when knowing very well almost everything is wrong in this home and you have still given the same on rent. We had to stay in dirty toilet water for many hours until your plumber said you better get out of this home otherwise you can all get sick. This is a complete lie that it got stuck due to wipes flushed down. We did have a statement recorded of your plumber, which is self explanatory. If you want, we can share the same.

You just can not imagine the inconvenience you have caused to us which runs into several thousand dollars plus till date we are not able to find a place and we are bearing the cost of the same and instead of returning the security deposit, trying to find ways and means to deny the same. This was never expected and I hope with due respect, honestly please return the security deposit.
June 29, 12:37 p.m.

Cox:      The actual amount due for the utilities is $146.59.

Regarding the plumbing issue, I never said that for sure that was issue but was merely the feedback we got from the plumber. He even mentioned it on the phone to me that night when he was there with you guys. We also saw the evidence when we were there the next day. I did hear the recording of what he said and he did misspeak as there was a clean out for the house. We found it in front of the house right off of the front porch. He had even told you that he didn't have the correct equipment to research the problem which is why he suggested you guys leave for the night until we could get out there with the proper equipment. Which we did the very next day. I can understand your frustration with this process and that is why we had said that we would allow you to break the lease. However until I get the final report and diagnosis for the plumbing issue I can't tell you one way or the

16

other what we would be able to do. You should understand our position on this this as we can only go by what we are being told. This house was in operating order and didn't have any issues prior as the gentleman that lived there before you guys lived there for years with no issues. All I am trying to say is give us time to sort this out.

June 29, 2021, 2:19 p.m.

Kumar:    Valerie,

Again your statement is very surprising, you said you bought this home and do not know anything about it. Now you are saying you know who lived and knows everything about this home, Everything is in the mails exchanged between us from day one. Do you want me to list everything? You are still non committing a refund on the security deposit. I do not know what kind of report you are waiting for since the 16th June 2021. If you do not refund the security deposit in this week, I have no other choice except to handover this to my lawyers for necessary action.

June 29, 2021, 2:40 p.m.

Kumar:    Valerie,

Hello, I will appreciate it if a full refund of the security deposit can be made.

July 13, 2021, 4:40 p.m.

Many of Kumar's emails contain a signature block stating "Regards, PRABHAT KUMAR" and reflect the name, address, telephone number, and website of his company. Emails Kumar sent from his personal email address, as opposed to his business email address, say "Regards, PRABHAT KUMAR." Cox's emails also contain a signature block showing the office manager's name, title, employer, address, and telephone number.

17

Attorney's Fees

Appellants' and Cox's or Appellee's counsel submitted their fees to the trial court through affidavits setting out their itemized fees and expenses, as well as their professional experience and expertise. Both stated that their fees complied with applicable Texas Supreme Court precedent.

Appellants' counsel sought $17,589.90 in fees as of the date of judgment, with contingent fee requests of $5,900 for representation before the Court of Appeals and up to $12,400 for representation at the Texas Supreme Court. The total fee requested to date includes nearly fifty hours of professional and paraprofessional time at hourly rates varying from $120 to $275.

Appellee's counsel requested $16,516.75 in legal fees, $2,740.25 in paralegal fees, and $139.46 in costs, for a total of $19,396.48. Although the lead attorney showed that his hourly rate was $590, he did not request payment for his work on the case, and billed for associates' and paralegals' time, only. The three associates billed for fifty hours of work at hourly rates of either $375 or $415.

Appellants' counsel controverted Appellee's counsel's requested fee, stating that in his professional opinion, the $19,396.48 fee Appellee's counsel sought "is neither reasonable nor necessary given the manner in which this

case was defended." More specifically, Appellants' counsel averred that Appellee's counsel "did very little in preparing this case for trial." Appellants' counsel then notes that no depositions were taken, few motions were filed, and the "limited discovery" required Appellee's counsel to produce 230 pages of documents and review sixty-five pages of documents. Appellants' counsel further claimed that the time entries and hourly rates counsel charged were excessive.

The Trial Court's Findings of Fact and Conclusions of Law

Findings of Fact:

1. On or about March 23, 2021, Plaintiffs Prabhat Kumar and Poonam Gupta ("Plaintiffs") and Defendant entered a Residential Lease (the "Lease") for the residence located at [address] in The Woodlands, Texas 77380 (the "Property").

2. The Lease term was March 25, 2021 through March 31, 3022.

3. The Plaintiffs moved into the Property on or around March 25, 2021.

4. The plaintiffs walked the Property before they signed the Lease.

5. The Plaintiffs accepted the Property as-is, and Defendant disclaimed any express or implied warranties as to the Property's condition.

6. After moving into the Property, the Plaintiffs notified Defendant regarding minor issues at the Property such as the doorbell, garage door opener, and electrical plugs, which the Defendant promptly addressed. Defendant notified the Plaintiffs that "[i]f there are any major issues that should arise

19

please feel free to let me know so we can address it in a timely manner."

7. The Lease does not provide a mailing address or forwarding address for the Plaintiffs.

8. The monthly rent for the Property under the Lease was $2,500.00.

9. The Plaintiffs did not pay the monthly rent under the Lease. Instead, the Lease's monthly rent was paid by Plaintiffs' insurance company. [] Thus, Plaintiffs did not incur these costs.

10. Plaintiffs paid Defendant a $2,500 security deposit under the Lease (the "Security Deposit").

11. Plaintiffs Poonam Gupta and Prabhat Kumar were listed as the sole tenants on the Lease.

12. The Lease provides that Plaintiffs were the only persons that may be permitted to reside on the Property during the term of the Lease.

13. The Lease provides that Plaintiffs may not permit any guest to stay on the Property longer than the amount of time permitted by and owners' association rule or restrictive covenant or 14 days without Defendant's written permission, whichever is less.

14. The Plaintiffs had been living at the Property for nearly three (3) months when the toilet overflow event occurred. No prior overflow events had occurred at the Property during Plaintiffs' occupation prior to the June 16, 2021 toilet overflow event made the basis of this lawsuit.

15. On June 16, 2021 at 3:18 pm, Plaintiffs notified Defendant that a toilet on the ground floor of the Property had backed up causing water to flow onto the floors of the Property.

16. On June 16, 2021, immediately after Defendant was notified of the toilet overflow, Defendant sent a plumber out to the Property to inspect and begin repairing the plumbing and wastewater issue at the Property. [] The plumber was there from around 3pm to 9pm that evening.

17. On June 16, 2021 at 7:57pm – just hours after Plaintiffs notified Defendant of the toilet overflow, and while Defendant was actively performing repairs at the Property, the Plaintiffs threatened to terminate the Lease, stating they "have no other choice except to cancel the lease and look for a new home as it is unsafe to live in a home not built/rented according to the city codes."

18. On June 17, 2021, Defendant sent a second plumber to the Property to continue addressing the plumbing issue, perform repairs, and begin remediation.

19. On June 17, 2021 at 1:05pm, Defendant notified Plaintiffs that they "have plumbers at the house working and also a restoration company coming to clean the carpet. It will take a couple of days to have everything fixed.

20. On June 17, 2021, one day after notifying Defendant of the plumbing issue, and while Defendant was diligently and actively repairing and remediating the toilet overflow event, Plaintiffs requested that Defendant allow them to break their lease without penalty or rental obligation through the end of the term.

21. On June 17, 2021 at 2:53pm, while Defendant was actively and diligently performing repairs at the Property, Ms. Jessica Kushto, who was Plaintiffs' agent, asked Defendant to confirm that the Plaintiffs could break their lease.

22. On June 18, 2021, while Defendant was actively and diligently performing repairs at the property, Ms. Kushto, acting as Plaintiffs' agent, asked Defendant to provide a signed letter stating that Defendant is releasing Plaintiffs from their lease agreement as of June 30, 2021.

21

23. At Plaintiffs' request, Defendant provided Plaintiffs a written notice dated June 21, 2021 agreeing to release Plaintiffs from the lease effective June 30, 2021.

24. Plaintiffs elected to terminate their lease rather than follow the procedures provided under Sections 92.056 and 92.0561 of the Texas Property Code.

25. On June 24, 2021, Plaintiffs notified defendant that they had moved everything out of the Property, effectively surrendering the Property under the terms of the Lease.

26. American Completion Tools paid for Plaintiffs' moving costs when they moved out of the property. The Plaintiffs did not incur these moving costs.

27. At that point, the parties no longer had a contract requiring duties of either of them; Plaintiffs did not have to pay rent, and Defendant did not have to provide housing.

28. The Lease provides that Plaintiffs must give Defendant at least thirty (30) days written notice of surrender before Defendant is obligated to account for or refund the security deposit.

29. The Lease provides that the Texas Property Code does not obligate a landlord to return or account for the security deposit until the tenant surrenders the Property and gives the landlord a written statement of the tenants forwarding address.

30. Plaintiffs never provided Defendant a written statement of their forwarding address for the purpose of refunding the Security Deposit.

31. The Lease Provides that the prevailing party in this lawsuit is entitled to recover from the non-prevailing party pre-judgment interest, attorney's fees, costs of service, and all other costs related to the legal proceeding.

22

Conclusions of Law:

1.This Court has jurisdiction of the parties and of the subject matter of this case.

2.The pleadings are in due form and contain all the allegations required by law.

3.The Lease was a valid and enforceable contract to which the Plaintiffs and defendant were parties.

4.Section 92.052(a) of the Texas Property Code provides that a landlord shall make a diligent effort to repair or remedy a condition if the condition materially affects the physical health or safety of an ordinary tenant.

5.Defendant is not liable to Plaintiffs under Section 92.056 of the Texas Property Code because:

  a. Defendant did not have a reasonable time to repair or remedy the condition after receipt of Plaintiffs' notice to repair or remedy issued on June 16, 2021; and/or

  b. Plaintiffs did not provide Defendant a subsequent written notice to repair or remedy the condition after a reasonable time to repair or remedy the condition following the first notice to repair or remedy on June 16, 2021; and/or

  c. Defendant made a diligent effort to repair or remedy the plumbing issue and wastewater overflow condition at the Property after receiving Plaintiffs' notice to repair or remedy on June 16, 2021.

6.Because Plaintiffs failed to establish liability by Defendant under Section 92.056(b) of the Texas Property Code, Plaintiffs were not entitled to the remedies provided for under Section 92.056(e) of the Texas Code, including terminating the lease.

23

7.Having reached an agreement to terminate the Lease, the Lease was terminated and the contractual relationship and obligations between the parties ended on June 30, 2021. That includes any obligation for Defendant to provide housing to Plaintiffs.

8.Because Plaintiffs failed to establish Defendant's liability under Section 92.056(b) of the Texas Property Code and because Plaintiffs asked to terminate the Lease on June 17, 2021 as a statement that they would not shelter at the Property any longer or ever again, and that Defendant owed them no further obligation of providing housing, Plaintiffs are not entitled to recover from Defendant any damages.

9.Specifically, Plaintiffs are not entitled to recover from Defendants the difference in rent between the Lease and the New Lease because Plaintiffs elected to terminate the Lease.

10.Further, Defendant did not violate the Lease and performed all its contractual obligations under the lease.

11.Further, Defendant performed all its statutory obligations under the Texas Property Code.

12.Under the terms of the Lease and in accordance with the Texas Property Code, Defendant was not obligated to account for or refund the Security Deposit because:

   a. Plaintiffs did not give Defendant at least thirty (30) days written surrender; and/or

   b. Plaintiffs did not provide Defendant a written statement of Plaintiffs' forwarding address for the purpose of returning the Security Deposit.

13.Defendant did not retain Plaintiffs' security deposit in bad faith.

24

14. Plaintiffs are not entitled to damages under Section 92.109 of the Texas Property Code because Plaintiff's Security Deposit was not wrongfully withheld.

15. During trial, the Plaintiffs non-suited their DTPA claim against Defendant.

16. Defendant is not liable to Plaintiffs for their attorney's fees and costs.

17. Plaintiffs shall take nothing by this lawsuit.

18. Defendant is a prevailing party in this lawsuit and is granted judgment against Plaintiffs for its reasonable and necessary attorney's fees and costs incurred in the amount of $19,257.00.

19. Any finding of fact that is a conclusion of law shall be deemed a conclusion of law. Any conclusion of law that is a finding of fact shall be deemed a finding of fact.

## STANDARD OF REVIEW AND APPLICABLE LAW

"A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Tex. Outfitters, Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019) (citation omitted). "'We review the trial court's conclusions of law de novo and its findings of fact for sufficiency of the evidence.'" *Geo Grp., Inc. v. Hegar*, 709 S.W.3d 585, 588 (Tex. 2025) (quoting *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020)). In a bench trial, the trial court is "the sole judge of the credibility of the witnesses and weight of the evidence, and [is] responsible for resolving conflicts in the evidence and drawing reasonable inferences from basic facts to ultimate facts."

25

*Cenlar FSB v. Champagne*, No. 09-22-00032-CV, 2024 Tex. App. LEXIS 368, at *41 (Tex. App.—Beaumont Jan. 18, 2024, pet. denied) (mem. op.). The testimony of an interested witness, even if uncontradicted, generally is not sufficient to conclusively establish a disputed fact. *Union Pac. R.R. v. Cezar*, 293 S.W.3d 800, 816 (Tex. App.—Beaumont 2009, no pet.). Instead, such testimony presents an issue to be decided by the trier of fact. *See id.*

"A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). When the party bearing the burden of proof at trial challenges an adverse outcome, the party must show on appeal that "the evidence establishes all vital facts in support of the issue[]" as a matter of law. *Cezar*, 293 S.W.3d at 807. Specifically referencing a landlord-tenant action, the tenant bears the burden of proof when attempting to "enforce a right resulting from the landlord's failure to repair or remedy a condition under Section 92.052." Tex. Prop. Code Ann. § 92.053(a).

To be enforceable, "a lease of real estate for a term longer than one year[]" must be in writing and "signed by the person to be charged with the promise or by someone lawfully authorized to sign for him." Tex. Bus. & Com. Code Ann. §

26

26.01(a), (b)(5). Since the lease, itself, must be written and signed, any modification or rescission of the lease generally must also be written and signed. *See Givens v. Dougherty*, 671 S.W.2d 877, 878 (Tex. 1984). There are, however, certain exceptions to this requirement of a signed writing, such as partial or full performance. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426–27 (Tex. 2015). Moreover, even when signed writings are required, "[t]he required memorandum need not always be a single document[.]" *Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 727 (Tex. 2020) (citations omitted). Instead, "multiple writings may comprise a contract 'even if the parties executed the instruments at different times and the instruments do not expressly refer to each other.'" *Id*. If a court considers multiple writings as a single contract, the "'essential elements of the agreement' must be evident 'from the writings' themselves, 'without resorting to oral testimony.'" *Id*. (quoting *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978)). "Emails are such writings." *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 669 (Tex. 2020).

Although the Texas Property Code directs a landlord to refund a tenant's security deposit "on or before the 30th day after the date the tenant surrenders the premises[,]" it permits a landlord to deduct damages and charges "for which the tenant is legally liable under the lease or as a result of breaching the lease." Tex. Prop. Code Ann. §§ 92.103, 92.104. The landlord does not become obligated to

27

either return or account for the tenant's security deposit, however, "until the tenant gives the landlord a written statement of the tenant's forwarding address for the purpose of refunding the security deposit." *Id*. at 92.107(a). Failure to provide this forwarding address does not cause the tenant to forfeit the right to either a refund or an accounting describing the damages and charges. *Id*. at 92.107(b).

We review a trial court's award of attorney's fees under an abuse of discretion standard. *See Tomsu v. Tomsu*, 381 S.W.3d 715, 719 (Tex. App.—Beaumont 2012, no pet.); *Shayn v. City of Houston*, 499 S.W.3d 12, 15 (Tex. App.—Houston [14th Dist.] 2016, no pet.). "The award of attorneys' fees rests in the sound discretion of the trial court and will not be reversed absent a clear showing of abuse of discretion." *Morrell Masonry Supply, Inc. v. Lupe's Shenandoah Reserve, LLC*, 363 S.W.3d 901, 909 (Tex. App.—Beaumont 2012, no pet.). "To recover attorney's fees, the party must prove the reasonableness of the fees." *Tomsu*, 381 S.W.3d at 719. A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *See Downer v. Aquamarine Operators*, Inc. 701 S.W.2d 238, 241–42 (Tex. 1985).

## ANALYSIS

In five issues, Appellants contend that the trial court erred by entering judgment in Cox's favor.

Issue One: Breach of Contract

Appellants argue on appeal that "[t]he trial court erred in entering a take-nothing judgment against [them] when all elements of their claims were established, and Landlord presented no contradictory testimony." According to Appellants, Cox was in breach of the lease contract when Appellants moved elsewhere after the house "became uninhabitable[,]" entitling them to the remedies set forth in the Property Code. The trial court found that the evidence does not show that Cox breached the lease. Since the evidence is sufficient to support the finding that Cox did not breach the contract, Appellants are not entitled to the statutory relief they seek.

The parties do not dispute that the lease was a valid contract, only whether Cox breached it. Appellants claim that Cox "presented no controverting evidence of diligent efforts to repair or remedy the condition[.]" We infer that Appellants contend that Cox breached its responsibility to "make a diligent effort to repair or remedy a condition if . . . the condition . . . materially affects the physical health or safety of an ordinary tenant[.]" Tex. Prop. Code Ann. § 92.052(a)(3)(A). The evidence shows that Cox had plumbers at the property within two hours of Kumar's notice of the problem. By the following day, Cox had a different plumbing company at the property and had retained a restoration company to clean the carpets. This evidence supports a finding that Cox made a "diligent effort to repair or remedy a condition" at the property, and Cox therefore did not violate either the lease or the

29

Property Code. Even without the foregoing evidence, Kumar agreed during his testimony that Cox made a diligent effort to repair the damage. Kumar's admissions of Cox's "diligent effort" negate any claim that Cox failed to make a diligent effort, thus further supporting the trial court's position that Cox made the necessary diligent effort to repair or remedy the condition at the property. It was unnecessary that Cox provide testimony about its diligent efforts to repair or remedy the condition, since Kumar, himself, provided testimony upon which the trial court relied to find that Cox diligently attempted to remedy the problem.

Since the trial court found that Cox complied with both the lease and the Property Code, by diligently attempting to repair or remedy the condition at the house, Appellants have failed to show Cox breached the contract or violated the Property Code provision regarding its duty to repair or remedy a condition that materially affects a tenant's physical health or safety. *See id*. § 92.052(a)(3)(A).

We overrule Appellants' first issue.

Issue Two: Lease Termination

Appellants next contend that since the record does not contain a signed writing showing that the parties agreed to terminate the lease, the trial court erred in determining that they terminated their lease with Cox. The lease provides for an early termination of the lease by agreement of the parties. The lease states that the lease

30

may not be changed except by written agreement and that all notices under the lease must be in writing.

The record shows the parties agreed in writing to terminate the lease early. The record contains Kumar's email to Jessica Kushto stating he had no other choice except to move out, and Kushto's email to Valerie asking Cox to provide a signed letter stating he released Appellees from the lease as of June 30, 2021. The record contains an email from Valerie to Kushto stating that Cox agreed to Appellees' moving out early.

Since the record contains evidence showing the parties agreed in writing to an early termination, we conclude the trial court did not err by concluding the parties reached an agreement to terminate the lease and that the lease terminated on June 30, 2021.

We overrule Appellant's second issue.

Issue Three: The Security Deposit

Appellants next posit that the trial court erred in deciding that Cox was not required to refund or account for its security deposit because Appellants did not give Cox thirty days' notice of surrender and because Appellants did not inform Cox of their forwarding address. Appellants concede, however, that Cox "was not obligated to return [the] security deposit until" Appellants provided a forwarding address. *See* Tex. Prop. Code Ann. § 92.107(a). When asked whether the lease provided his or

31

his wife's forwarding address, Kumar acknowledged that it did not. Kumar further acknowledged that although he requested Cox to return his security deposit, he did not give Cox written notice of his forwarding address for the purpose of refunding his security deposit. Instead, he stated that Cox had his address, as his email signature block contained his office address.

Since both the lease and the applicable statute require a tenant to provide his forwarding address to trigger the landlord's obligation to either refund or account for a tenant's security deposit, and since Appellant admittedly failed to give Cox this information, Cox was not required to refund or account for Appellants' security deposit as of the time of trial. *See id.*; *see also Robinson v. Bontha*, No. 01-19-00777-CV, 2020 Tex. App. LEXIS 9836, at *6 (Tex. App.—Houston [1st Dist.] Dec. 15, 2020, no pet.) (mem. op.). Again, Kumar's own testimony agreeing that he had not given Cox his forwarding address for the purpose of refunding or accounting for the security deposit negated his claim to statutory remedies.

Even though Cox had Kumar's business address, this information was insufficient to activate Cox's obligations to refund or account under the Property Code. *See Swan v. Bienski Props., LP*, No. 10-14-00309-CV, 2018 Tex. App. LEXIS 7665, at *16–18 (Tex. App.—Waco Sept. 19, 2018, no pet.) (mem. op.). In *Swan*, our sister court considered and rejected the same argument, stating that "whether Bienski had a forwarding address for Alexis is irrelevant to whether Bienski's

32

obligation to return Alexis's security deposit under chapter 92, subchapter C was triggered." *Id*. at *17. Since the *Swan* tenant admitted not having provided the landlord with a forwarding address for the purpose of refunding the security deposit, the court determined that the tenant had not complied with the Property Code, and the landlord thus was not yet required to refund or account for the deposit. *Id*. at *16–18. We reach the same conclusion and decide that the trial court correctly determined that since Appellants had not provided Cox with a forwarding address for the purpose of refunding or accounting for the security deposit, Cox was not yet required to refund or account for the deposit. We overrule issue three.

Issue Four: Evidence of a Collateral Source

Appellants' fourth issue complains that the trial court considered their insurance benefits to determine that they had sustained no damages. Appellants contend that these payments constitute inadmissible evidence of a collateral source. However, the trial court found Cox was not liable for breaching the contract. Since the disposition of this issue would not affect the outcome of this appeal, we need not consider it. Tex. R. App. P. 47.1.

Issue Five: Cox's Attorney's Fees

Appellants contend that the trial court awarded Cox "excessive, unnecessary and unreasonable fees." In particular, Appellants contend that Cox "did little to nothing to work up this case[,]" and state that "TD Cox's counsel basically did

nothing to prepare this for trial other than file an answer and its pretrial documents." Appellants support their contention by citing the limited discovery and the lack of depositions conducted. Appellants also challenge the hourly rates charged by Cox's attorneys.

In determining a reasonable fee, a court should consider evidence of the following factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill [required] to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Morrell Masonry Supply*, 363 S.W.3d at 909 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)).

Cox's fee affidavit requested fees of $19,257 and outlines the qualifications of the attorneys handling the case and includes a redacted version of counsel's billing

34

statements showing the activities it undertook in defending the case. These statements include entries for not only the answer and limited discovery Appellants cite, they include speaking with the client, drafting motions and discovery, and discussing trial strategy, as well as reviewing multiple documents in preparation for trial.

Cox's attorney also included the following table showing the hours expended and the hourly rates charged:

| Timekeeper | Title | Hourly Rate | Hours Bille[d] | Total Fees Billed |
|---|---|---|---|---|
| [lead counsel] | Partner | $590 | 0 | $0.00 |
| [associate one] | Associate | $375 | 22.9 | $6636.75 |
| [associate two] | Associate | $415 | 22.7 | $8230 |
| [associate three] | Associate | $375 | 51.3 | $1650 |
| Total | | $438.75 (avg) | 51.3 | 16,516.75 |

| Timekeeper | Title | Hourly Rate | Hours billed | Total Fees Billed |
|---|---|---|---|---|
| [paralegal one] | Paralegal | $295 | 11.9 | $2607.50 |
| [paralegal two] | Paralegal | $295 | .90 | $132.75 |
| Total | | $295 (avg) | 12.8 | $2740.25 |

Applying the above hourly rates to the number of hours shown reveals that the totals shown have been reduced, since Cox's lead counsel used his billing judgment "to eliminate any excessive or unproductive time for which attorney's fees are sought." Lead counsel also did not bill for his own participation in preparation and trial, although his affidavit shows that he supervised the associates working on trial preparation and the record further reflects that he was present at trial. Had Cox's lead counsel not reduced the number of hours charged, Cox's attorney's fee would have totaled $41,021.50, more than twice the amount the trial court awarded in fees. Since counsel had already reduced the fee sought, the trial court did not necessarily abuse its discretion by not further reducing the fee.

As for the remaining *Arthur Andersen* factors, lead counsel's affidavit states that he was familiar with "reasonable and necessary charges for legal work involving questions of law and facts similar to those involved in this case." *See Arthur Andersen*, 945 S.W.2d at 818. Based on that knowledge, counsel stated that the amounts charged were reasonable and necessary. Counsel also listed these factors and explained how they justified the total fee requested. He particularly referenced the case outcome, noting that his "[f]irm provided a substantial benefit to the client[]" by winning the case.

Cox's fee request of $19,396.48 is $1806.58 more than the $17,589.90 Appellants sought for work performed through the date of judgment. When

considering the $5,900 Appellants sought for the cost of an appeal to this Court, Cox's requested fee is $4093.42 less than the fee Appellants consider reasonable and necessary. Considering these figures, we cannot conclude that the trial court abused its discretion in awarding Cox $19,257 in attorney's fees, and Appellants have not shown otherwise. *See Morrell Masonry Supply, Inc.,* 363 S.W.3d at 909 (requiring a "clear showing of abuse of discretion[]" to reverse a trial court's fee award).

We overrule Appellants' fifth issue.

## CONCLUSION

Having overruled the dispositive issues Appellants have raised, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on August 28, 2025
Opinion Delivered November 6, 2025

Before Golemon, C.J., Wright and Chambers, JJ.